No. 24-40703

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT


UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*


v.


GEORGE JIMENEZ,
*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

**Brief of Defendant-Appellant**
_____




Mark Yanis
Texas Bar No. 00792924
California Bar No. 247214
2151 Pacific Ave.
Costa Mesa, CA 92627
(949) 769-4872
markyanis@gmail.com
*Attorney for Defendant-Appellant*

## Certificate of Interested Persons
*United States v. George Jimenez*
No. 24-40703

This counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

Jeffrey V. Brown, District Court judge

George Jimenez, defendant-appellant

Sherin Daniel, AUSA at trial

Karen Lansden, AUSA at trial

Carmen Mitchell, AUSA on appeal

David A. Nachtigall, trial counsel for Mr. Jimenez

Mark Yanis, appellate counsel for Mr. Jimenez

March 15, 2025                                Respectfully submitted,

                                             s/ Mark Russell Yanis
                                             Attorney for appellant

## Statement on Oral Argument

This brief raises two fairly complex issues on statutory interpretation, both of which have given rise to circuit splits that this Court has not fully addressed. One issue also presents a corpus linguistics analysis showing that the original public meaning of the term at issue ("sexual activity") does not cover the conduct alleged against him. Jimenez thus requests oral argument.

# Table of Contents

Certificate of Interested Persons ............................................................. ii

Statement on Oral Argument ................................................................. iii

Issues Presented for Review ................................................................. 1

Statement of the Case ......................................................................... 2

Summary of the Argument .................................................................... 6

Argument ...................................................................................... 11

I.  The evidence was insufficient to prove that Jimenez attempted to persuade P.W. to engage in "sexual activity" because the original public meaning of that term in 1998 required physical sexual conduct, which he never sought ..................................................... 11

    A.  Standard of review ................................................................. 11

    B.  The court must give effect to the ordinary meaning of "sexual activity" when the term was added to the statute in 1998 ... 12

    C.  The Supreme Court requires interpreting phrases as a unit, not by combining the meanings of the individual words ...... 12

    D.  Black's Law Dictionary defines "sexual activity" as requiring physical sexual contact ........................................................ 17

    E.  Corpus linguistics confirms that the ordinary meaning of "sexual activity" entails physical sexual contact .................. 19

    F.  Additional empirical evidence shows "sexual activity" involves physical sexual contact ........................................... 28

    G.  Circuit courts disagree on the definition of "sexual activity" .. ........................................................................................ 33

H.     The rule of lenity requires adopting the narrower interpretation of "sexual activity" .........................................37

I.     Congress's 2023 amendment cannot alter the original public meaning of "sexual activity" in 1998 ....................................38

II.    The evidence was insufficient to prove that Jimenez attempted to persuade P.W. to engage in "sexually explicit conduct"—specifically "lascivious exhibition" of the pubic area—because Jimenez's requests for photos specified nothing that would make them objectively lascivious ...........................................................40

A.     Supreme Court precedent requires objective analysis of whether images are lascivious...............................................42

B.     Circuit courts disagree on whether to apply an objective or subjective analysis of "lascivious exhibition" .......................45

C.     This Circuit has not squarely addressed whether to apply an objective or subjective analysis...........................................47

D.     The statute's text and structure require objective analysis of "lascivious exhibition"..........................................................50

E.     Courts cannot use evidence supporting the intent element under § 2251(a) to establish "lascivious exhibition" under § 2256(2)(A)(v) .........................................................................52

F.     The evidence fails to support "lascivious exhibition" under the *Dost* factors objectively applied ......................................58

G.     The rule of lenity requires adopting the narrower interpretation of "lascivious exhibition" ...............................61

Conclusion.............................................................................................61

Certificate of Service and Compliance with ECF ....................................62

# Table of Authorities

## Cases

*Bartenwerfer v. Buckley*, 598 U.S. 69 (2023) ...........................................61

*Bostock v. Clayton Cty.*, 590 U.S. 644 (2020)..........................................14

*Calder v. Bull*, 3 U.S. (3 Dall.) 386 (1798) ..............................................43

*Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023)....................................24

*Carpenter v. United States,* 585 U.S. 296  (2018) ............................23, 31

*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249 (1992) ......................57

*Dean v. United States*, 556 U.S. 568 (2009)...........................................60

*Facebook, Inc. v. Duguid*, 592 U.S. 395 (2021) ......................................24

*FCC v. AT&T Inc.*, 562 U.S. 397 (2011) ...............................8, 14, 37, 40

*Fulkerson v. Unum Life Ins. Co. of Am.*, 36 F.4th 678 (6th Cir. 2022)...23

*Harrison v. Vose*, 50 U.S. 372 (1850) ......................................................41

*Helvering v. Gregory*, 69 F.2d 809 (2d Cir. 1934) ..................................14

*In re Estate of Heater*, 498 P.3d 883 (Utah 2021) ..................................23

*Jackson v. Virginia*, 443 U.S. 307 (1979) ...............................................12

*Jones v. Governor of Fla.*, 975 F.3d 1016 (11th Cir. 2020) .....................39

*Keene Corp. v. United States*, 508 U.S. 200 (1993) .................................57

*Matthews v. Indus. Comm'n of Ariz.*, 520 P.3d 168 (Ariz. 2022) ...........23

*McBoyle v. United States*, 283 U.S. 25 (1931).........................................15

*Moskal v. United States*, 498 U.S. 103 (1990) ...................................41, 67

*Muscarello v. United States*, 524 U.S. 125 (1998) ...........................24, 31

*N.Y. Tr. Co. v. Comm'r*, 68 F.2d 19 (2d Cir. 1933)..................14

*People v. Harris*, 885 N.W.2d 832 (Mich. 2016) .....................23

*Perrin v. United States*, 444 U.S. 37 (1979) ...........................13

*Richards v. Cox*, 450 P.3d 1074 (Utah 2019) .........................23

*Skilling v. United States*, 561 U.S. 358 (2010) ......................41

*State v. Misch*, 256 A.3d 519 (Vt. 2021)................................23

*State v. Rasabout*, 356 P.3d 1258 (Utah 2015) ......................29

*United States v. Allen*, 587 F.3d 246 (5th Cir. 2009) ..............12

*United States v. Amirault*, 173 F.3d 28 (1st Cir. 1999) ...................50, 59

*United States v. Bailey*, 444 U.S. 394 (1980) .........................58

*United States v. Barry,* 634 F. App'x 407 (5th Cir. 2015) ......................54

*United States v. Boler*, 115 F.4th 316 (4th Cir. 2024) ............................23

*United States v. Brown*, 579 F.3d 672 (6th Cir. 2009)...........................51

*United States v. Courtade*, 929 F.3d 186 (4th Cir. 2019) ................51, 59

*United States v. Dominguez*, 997 F.3d 1121 (11th Cir. 2021) ........ passim

*United States v. Hillie*, 14 F.4th 677 (D.C. Cir. 2021) ...........................48

*United States v. Johnson*, 719 F. Supp. 2d 1059 (W.D. Mo. 2010) .........54

*United States v. Rice*, 36 F.4th 578 (4th Cir. 2022) ...............................21

*United States v. Rumely*, 345 U.S. 41, 45 (1953) ...................41

*United States v. Santos*, 553 U.S. 507 (2008) .......................37

*United States v. Seefried*, 639 F.Supp.3d 8 (D.D.C. 2022)......................23

*United States v. Shiu Sun Shum*, 496 F.3d 390 (5th Cir. 2007) ...........11

*United States v. Spoor*, 904 F.3d 141 (2d Cir. 2018) ............................50

*United States v. Staggers*, 961 F.3d 745 (5th Cir. 2020) .......................12

*United States v. Steen*, 634 F.3d 822 (5th Cir. 2011).....................passim

*United States v. Taylor*, 640 F.3d 255, 257 (7th Cir. 2011) ..............36, 39

*United States v. Villard*, 885 F.2d 117 (3d Cir. 1989) ...........................50

*United States v. Wallenfang*, 568 F.3d 649 (8th Cir. 2009)...................51

*United States v. Wilkerson*, 124 F.4th 361 (5th Cir. 2024)............passim

*United States v. Yeatts*, 639 F.2d 1186 (5th Cir. 1981) .......................13

*Waetzig v. Halliburton Energy Servs., Inc.*, 82 F.4th 918 (10th Cir. 2023)
..........................................................................................................23

*Wilson v. Safelite Grp., Inc.*, 930 F.3d 429 (6th Cir. 2019).....................23

*Wis. Cent. Ltd. v. United States*, 585 U.S. 274 (2018) ...........................42

**Statutes**

18 U.S.C. § 1470..................................................................................2, 4

18 U.S.C. § 2251(a) ......................................................................passim

18 U.S.C. § 2252A(a)(3)(B).....................................................................57

18 U.S.C. § 2256(2)(A)(v) ..............................................................passim

18 U.S.C. § 2422(b) ......................................................................passim

18 U.S.C. § 2427.................................................................................33, 39

18 U.S.C. § 3231.................................................................. 1

28 U.S.C. § 1294.................................................................. 1

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 356 (2012 ..........................................................14

B. Garner, *Modern English Usage* 676 (4th ed. 2016)...........................55

Thomas R. Lee & James C. Phillips, *Data-Driven Originalism*, 167 U. Pa. L. Rev. 261 (2019) ...............................................19

Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L. J. 788 (2018) ......................................20

Thomas R. Lee & Stephen C. Mouritsen, *The Corpus and the Critics*, 88 U. Chi. L. Rev. 275 (2021).......................................21

W. Eskridge, *Interpreting Law* 62 (2016) ..................................13

## Subject Matter and Appellate Jurisdiction

The District Court had jurisdiction under 18 U.S.C. § 3231. On October 16, 2024, the District Court entered final judgment. ROA.223-28. On October 24, 2024, Jimenez filed notice of appeal. ROA.218. This Court has jurisdiction over appeals from final judgments under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1294.

## Issues Presented for Review

1.      Whether the evidence was insufficient to prove that Jimenez attempted to persuade a minor to engage in "sexual activity" because the original public meaning of that term required some form of physical sexual contact, which he did not request.

2.      Whether the evidence was insufficient to prove that Jimenez attempted to persuade a minor to engage in "sexually explicit conduct"—specifically "lascivious exhibition" of the pubic area—because his requests for photos specified nothing that would make them objectively lascivious.

## Statement of the Case

On June 5, 2019, George Jimenez was charged by indictment with two counts of coercion and enticement of a minor in violation of 18 U.S.C. § 2422 and five counts of transfer of obscene material to a minor in violation of 18 U.S.C. § 1470. ROA.30-34.

Jimenez waived his right to a jury trial for Count One. ROA.154. On April 3, 2024, a one-day bench trial was held on this count before Judge Jeffrey Brown. ROA.239-335. At its conclusion, Jimenez pleaded guilty to Counts Three and Four. ROA.324-33.

On April 23, 2024, the court issued its opinion and conclusions of law in which it found Jimenez guilty of Count One. ROA.154-170.

On October 16, 2024, the court sentenced Jimenez to a prison term of 240 months for Count One, and 120 months for each of Counts Three and Four, all to run concurrently. ROA.223-24. Additionally, it imposed ten years' supervised release for Count One, and three years' supervised release for Counts Three and Four, concurrently; a $300 special assessment; and no fine. ROA.225-27. The court also dismissed the

remaining counts on the government's motion. ROA.212. On October 24,

2024, Jimenez filed notice of appeal. ROA.218

## The Indictment and Relevant Statutes

Appellant was indicted in Count One as follows:

GEORGE JIMENEZ,

did use a facility and means of interstate and foreign commerce to knowingly persuade, induce, entice and coerce, and to knowingly attempt to persuade, induce, entice and coerce, P.W., an individual who had not attained the age of 18 years, to engage in sexual activity for which the defendant could be charged with a criminal offense, specifically, sexual exploitation of children pursuant to 18 United States Code, Section 2251(a) and (e).

In violation of Title 18, United States Code, Sections 2422(b) & (2).

ROA.30.

Appellant was convicted under 18 U.S.C. § 2422(b), which states:

Whoever . . . knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.

18 U.S.C.S. § 2422.

As its predicate offense under section 2422, the government

alleged "sexual exploitation of children," which states:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, . . . with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . . shall be punished as provided under subsection (e).

18 U.S.C. § 2251(a)

"[S]exually explicit conduct" under § 2251(a) means actual or simulated:

> (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;
>
> (ii) bestiality;
>
> (iii) masturbation;
>
> (iv) sadistic or masochistic abuse; or
>
> (v) lascivious exhibition of the anus, genitals, or pubic area of any person;

18 U.S.C. § 2256(2)(A).

## Factual Background

This case was tried to the bench, mainly on stipulated facts. ROA.242-50. Over approximately six weeks in 2019, Jimenez posed as a teenage boy to communicate with 13-year-old P.W. and other minor females. ROA.243. He sent at least five photos of his penis to the minors, ROA.242, 245, for which he pled guilty to 18 U.S.C. § 1470, and was sentenced to 10 years' imprisonment. ROA.224.

Pertinent to Count One, Jimenez sent a series of very graphic and inappropriate text messages to P.W., a 13-year-old girl about his sexual desires and fantasies. ROA.242-50. For example, he texted her, "where do you want my cock to go in" and "you want it in your sweet little pussy or in that juice ass." ROA.245, 282.

On April 3, 2019, after P.W. mentioned shaving her pubic area, Jimenez responded, "I have to see that" and "Just the top half." ROA.246. He later said "I want to see that shaved pic, lol" ROA.246. In the same exchange, when P.W. offered to send a picture of herself in a bra, Jimenez replied "But how about that pubic part too. That you shave...is got to look amazing." ROA.246.

Much of this was repeated at trial through the government's only live witness, FBI Agent Laura Brunstetter, as well as from video of investigators interviewing P.W. ROA.251-301.

On cross-examination, Agent Brunstetter agreed that Jimenez never attempted to meet with or personally photograph P.W. ROA.298-99. Nor, she agreed, did Jimenez ask P.W. to send a photo of her touching herself. ROA.300-01.

## Rule 29 Motion

After the government rested, Mr. Jimenez did not put on evidence and moved for acquittal under Rule 29:

> For the purposes of preserving the record, Your Honor, at this time I move for a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, essentially that the evidence presented by the government is not factually sufficient to meet the standards under the law.

ROA.312.

The court denied the motion. ROA.313.

## The Court's Findings and Conclusions

The court found Jimenez guilty. Its written findings and conclusions stated that "the Government has proven beyond a reasonable doubt that Jimenez persuaded, induced, enticed, or coerced P.W. to engage in lascivious exhibition of her genitals or pubic area. Jimenez directly and repeatedly requested that P.W. send pictures of her pubic area." ROA.168.

## Summary of the Argument

The parties agreed that Jimenez sent text messages to P.W. requesting she text him photos of her "pubic area," which he intended to

use for his own sexual gratification. This appeal challenges his conviction on two statutory interpretation grounds. First, whether Jimenez's requesting such photos by text message constituted an attempt to have her engage in "sexual activity" under 18 U.S.C. § 2422(b). Second, whether Jimenez's subjective purpose can transform an otherwise non-lascivious image into a "lascivious exhibition" under 18 U.S.C. § 2256(2)(A)(v).

In Issue One, Jimenez presents multiple legal and empirical sources establishing that the ordinary meaning of "sexual activity" when Congress added this undefined term to the statute in 1998 required interpersonal physical contact. First, Black's Law Dictionary's 1999 definition explicitly required physical contact. Second, a corpus linguistics analysis from that period confirms that the ordinary meaning of "sexual activity" involved physical contact. Both sources also establish that "sexual activity" is a phrase that carries a specialized and narrower meaning than the sum of its individual words.

These findings align with sound statutory interpretation principles. As the Supreme Court recognizes, phrases may carry

narrower meanings than their component words, thus cannot be mechanically interpreted by combining their individual dictionary definitions, which may create overly expansive definitions. *FCC v. AT&T Inc.*, 562 U.S. 397, 406 (2011). This principle applies to "sexual activity."

Despite this clear guidance on statutory interpretation, circuits have split over the meaning of "sexual activity." The Seventh Circuit correctly held that "sexual activity" requires interpersonal contact, while the Fourth and Eleventh Circuits expanded the term far beyond its ordinary meaning by separately defining and recombining its component words—precisely the approach the Court rejected in *FCC v. AT&T.*

Because neither Jimenez's remote request for photos nor the minor's act of taking them would involve any physical sexual contact, interpersonal or otherwise, the evidence was insufficient to support his conviction on Count One.

For its predicate offense under § 2422, the government alleged that Jimenez violated 18 U.S.C. § 2251(a), which required proving he

attempted to persuade a minor to send an image depicting "sexually explicit conduct," specifically, "lascivious exhibition of the . . . pubic area" under § 2256(2)(A)(v).

In Issue Two, Jimenez argues that the evidence supporting his conviction is insufficient because he requested photos without specifying any poses, settings, or features that would make such photos a *lascivious* exhibition of the pubic area. The central question here is whether courts must determine lasciviousness based solely on objective features visible within the four corners of an image, or whether courts may consider a defendant's subjective intent to transform an otherwise non-lascivious image into a lascivious one.

The Supreme Court requires objective analysis. To prevent overbreadth by ensuring protected images aren't criminalized, the Court in *New York v. Ferber* limited child pornography laws to images that "*visually* depict sexual conduct." 458 U.S. 747, 764 (1982) (emphasis in original). Similarly, in *United States v. Williams*, the Court emphasized that images must "in fact" depict "sexually *explicit* conduct." 553 U.S. 285, 301 (2008) (emphasis in original). The Court's

repeated emphasis on *visual* depiction necessarily limits courts to making this decision based on what appears within the image itself, not what a defendant subjectively intends. Thus while a defendant's intent is relevant for the mental state element of the crime, it cannot transform a non-lascivious image into a lascivious one.

Courts have struggled with this distinction when applying the "*Dost* factors," a confusing and controversial multi-factor tool to assess lasciviousness. *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986). This has caused a split among circuits, with some requiring lasciviousness be determined solely by what the visual depiction captures and others permitting consideration of subjective evidence.

This Circuit requires applying the *Dost* factors, but no panel has meaningfully addressed whether it must apply objective analysis in determining lasciviousness. This Court should adopt an objective approach to comply with Supreme Court precedent and the statutory text.

Because Jimenez's subjective intent cannot transform objectively non-lascivious images into lascivious ones, the government failed to

prove the "sexually explicit conduct" element of the predicate offense

under Count One

## Argument

**I. The evidence was insufficient to prove that Jimenez attempted to persuade P.W. to engage in "sexual activity" because the original public meaning of that term in 1998 required physical sexual conduct, which he never sought**

### A. Standard of review

Jimenez moved for a judgment of acquittal at the close of

evidence, thus this issue is preserved and this Court reviews it de novo.

*United States v. Shiu Sun Shum*, 496 F.3d 390, 391 (5th Cir. 2007). In

deciding whether the evidence was sufficient, the court reviews the

evidence in the light most favorable to the judgment to determine

whether a rational trier of fact could have found that the evidence

established the essential elements of the offense beyond a reasonable

doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States

v. Allen*, 587 F.3d 246, 256 (5th Cir. 2009) (per curiam) (bench trial).

Absent sufficient evidence, due process requires a judgment of

acquittal. *United States v. Staggers*, 961 F.3d 745, 756 (5th Cir. 2020).

**B.    The court must give effect to the ordinary meaning of "sexual activity" when the term was added to the statute in 1998**

Congress added "sexual activity" to § 2422 in 1998 without defining it. *United States v. Dominguez*, 997 F.3d 1121, 1124-25 (11th Cir. 2021), *citing* Protection of Children from Sexual Predators Act of 1998, Pub. L. No. 105-314, § 102, 112 Stat. 2934. Accordingly, the "words will be interpreted as taking their ordinary, contemporary, common meaning" at the time of enactment. *Perrin v. United States*, 444 U.S. 37, 42 (1979). The court must assume that Congress used the words of the statute as they were commonly and ordinarily understood. *United States v. Yeatts*, 639 F.2d 1186, 1189 (5th Cir. 1981).

**C.    The Supreme Court requires interpreting phrases as a unit, not by combining the meanings of the individual words**

"Sexual activity" is a specialized phrase used for many decades to refer to interpersonal sexual contact. Accordingly, it cannot be mechanically defined by combining the dictionary definitions of "sexual" and "activity," as some courts have done. Rather, the Court holds that determining ordinary meaning requires assessment of the complete

phrase rather than its individual words. The correct approach was exemplified in Chief Justice Roberts' unanimous opinion when rejecting a party's literal and broader definition of "personal privacy":

> AT&T's argument treats the term "personal privacy" as simply the sum of its two words: the privacy of a person. . . . But two words together may assume a more particular meaning than those words in isolation. We understand a golden cup to be a cup made of or resembling gold. A golden boy, on the other hand, is one who is charming, lucky, and talented. A golden opportunity is one not to be missed. "Personal" in the phrase "personal privacy" conveys more than just "of a person."

*FCC v. AT&T Inc.*, 562 U.S. 397, 406 (2011).

This is especially crucial in criminal prosecutions because a phrase can cover a "dramatically *smaller* category than either component term." W. Eskridge, *Interpreting Law* 62 (2016) (emphasis added). Rather, courts must take care to follow ordinary meaning "when two words combine to produce a meaning that is not the mechanical composition of the two words separately." *Id.*

Further, Justice Scalia stressed that courts must hew to the fair rather than literal meaning of a phrase: "Adhering to the *fair meaning* of the text (the textualist's touchstone) does not limit one to

the hyperliteral meaning of each word in the text. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 356 (2012) (emphasis in original). Nearly a hundred years ago, Judge Hand recognized that "'a sterile literalism . . . loses sight of the forest for the trees.' The full body of a text contains implications that can alter the literal meaning of individual words." *Ibid.*, *quoting N.Y. Tr. Co. v. Comm'r*, 68 F.2d 19, 20 (2d Cir. 1933)). As he put it in another case, "the meaning of a sentence may be more than that of the separate words, as a melody is more than the notes." *Helvering v. Gregory*, 69 F.2d 809, 810–11 (2d Cir. 1934). As Justice Kavanaugh more recently observed, the "Supreme Court's precedents and longstanding principles of statutory interpretation teach a clear lesson: Do not simply split statutory phrases into their component words, look up each in a dictionary, and then mechanically put them together again." *Bostock v. Clayton Cty.*, 590 U.S. 644, 789 (2020) (Kavanaugh, J., dissenting).

These authorities teach that compound phrases such as "sexual activity" often develop narrower or more specialized meanings than their the combined definitions of their individual words. For instance,

"gang activity" has acquired a specialized meaning beyond simply "activities done by gangs," referring to organized criminal behavior and patterns of conduct associated with gang membership. Courts and law enforcement don't use "gang activity" to refer to gang members going bowling or having lunch together; the compound term has come to connote specific types of organized criminal conduct.

This applies to "sexual activity" in 18 U.S.C. § 2422(b). Just as "gang activity" and "personal privacy" have developed narrower meanings than their component words, "sexual activity" has acquired a particular meaning focused on physical sexual acts rather than just *any* activity with a sexual component.

As shown below, the Fourth and Eleventh Circuits constructed an extremely broad definition of "sexually activity" by employing this mechanical interpretive method, thus expanding criminal liability far beyond the ordinary meaning of Congress's carefully chosen words. This raises similar fair notice problems that Justice Holmes recognized nearly 100 years ago in *McBoyle v. United States*, 283 U.S. 25, 27 (1931). There, the Court refused to extend the Motor Vehicle Theft Act

to airplanes. The unanimous Court observed that while "etymologically it is possible to use the word [vehicle] to signify a conveyance working on land, water or air... in everyday speech 'vehicle' calls up the picture of a thing moving on land." 283 U.S. at 26. The Court refused to read words that "have no reference of any kind to aircraft, as including airplanes under a term that usage more and more precisely confines to a different class." *Id.*

Jimenez's position is at least as strong as the defendant's in *McBoyle*. There, prosecutors could at least point to "any other self-propelled vehicle" in the statute to justify including aircraft. But there is no such textual hook to expand "sexual activity" beyond its common understanding, which our corpus analysis below confirms overwhelmingly referred to interpersonal physical contact in 1998. Justice Holmes' insistence that "fair warning should be given to the world in language that the common world will understand," *id.* at 27, applies no less forcefully here. Just as extending "vehicle" to include then-uncommon airplanes violated due process, expanding "sexual activity" beyond physical contact to include attempting to obtain photos

by text, which was virtually nonexistent when Congress enacted § 2422, would deny defendants fair notice of prohibited conduct.

Jimenez will show in the following sections that multiple interpretative tools establish that the ordinary meaning of "sexual activity" in 1998 referred to interpersonal sexual contact, and in no case did it extend to appellant's requests for photos.

### D. Black's Law Dictionary defines "sexual activity" as requiring physical sexual contact

In 1998, Congress added "sexual activity" to section 2422 without defining it. *See Dominguez*, 997 F.3d at 1124. The 7th Edition of Black's, issued in 1999, contains an entry for "SEXUAL ACTIVITY," which states "See SEXUAL RELATIONS."[1] The full corresponding definition is:

---

[1] The Black's "see" signal is different than the Bluebook's "see" signal. Black's explains that "see" serves three purposes: (1) "To indicate that the definition is at another location in the dictionary," (2) "To refer to closely related terms," or (3) "To refer to a synonymous subentry." *Black's Law Dictionary*, xix (7th Ed. 1999). When Black's directs readers from "sexual activity" to "sexual relations" and then explicitly states that sexual relations is "Also termed sexual activity," it makes a clear definitional choice through its established reference system. Conversely, the Bluebook's "see" means that an "authority supports, but does not directly state, the proposition." *The Bluebook: A Uniform System of Citation* B1.2, at 4 (Columbia L. Rev. Ass'n et al. eds., 21st ed. 2020).

sexual relations. 1. Sexual intercourse. — Also termed carnalis copula. 2. Physical sexual activity that does not necessarily culminate in intercourse. • Sexual relations usu. involve the touching of another's breast, vagina, penis, or anus. Both persons (the toucher and the person touched) engage in sexual relations. — Also termed sexual activity.

*Black's Law Dictionary* 1379 (7th ed. 1999).

This definition expressly requires sexual "touching" of "another" while covering no activities that do not involve touching.

Indeed, other definitions in Black's confirm that "sexual activity" almost invariably involves physical sexual contact:

Bestiality: "Sexual activity between a human and an animal." *Black's Law Dictionary* at 153.

Molestation: "child molestation. Any indecent or sexual activity on, involving, or surrounding a child , usu. under the age of 14." *Id*. at 233, 1021.

Child pornography: "Material depicting a person under the age of 18 engaged in sexual activity." *Id*. at 1181.

Prostitution: "The act or practice of engaging in sexual activity for money or its equivalent." *Id*. at 1238.

Rape: "Unlawful sexual activity (esp. intercourse) with a person (usu. a female) without consent and usu. by force or threat of injury." *Id*. at 1267.

Therefore, these definitions provide compelling evidence that: (1) both the ordinary and legal meanings of "sexual activity" in 1998 almost always required interpersonal sexual contact, and (2) "sexual activity"

is a compound term with a narrower meaning than the sum of its component words. As the Supreme Court recognizes, "Two words together may assume a more particular meaning than those words in isolation." *FCC v. AT&T*, 562 U.S. at 406.

These definitions also align with the ordinary meaning shown by the corpus linguistics analysis below, where 104 of 105 contemporaneous uses of "sexual activity" refer to physical sexual contact.

### E. Corpus linguistics confirms that the ordinary meaning of "sexual activity" entails physical sexual contact

Corpus linguistics is a relatively new but powerful tool for interpreting the common understanding or meaning of words or terms in a statute, constitution, or other texts. It is "the study of language (linguistics) through systematic analysis of data derived from large databases of naturally occurring language (corpora, the plural of corpus, a body of language)." *United States v. Rice*, 36 F.4th 578, 583 (4th Cir. 2022), *quoting* Thomas R. Lee & James C. Phillips, *Data-Driven Originalism*, 167 U. Pa. L. Rev. 261, 289 (2019). As former Utah

Supreme Court Justice Lee, an early advocate of corpus linguistics put it, "corpus linguistics is an empirical approach to the study of language that involves large, electronic databases" which are used to "draw inferences about language from data gleaned from real--world language in its natural habitat--in books, magazines, newspapers, and even transcripts of spoken language." Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L. J. 788, 828 (2018).

In practical terms, "corpus linguistics allows lawyers or judges to search online databases that contain words and phrases within a specific population during a given time period." *United States v. Rice*, 36 F.4th at 583. The uses "can then be reviewed one by one, in their context, to determine the meaning of a word or phrase," and when "reviewed as a whole, a broad picture of how a word or phrase was customarily used and understood during a specific time period can emerge." *Ibid.*

Many federal and state courts have used corpus linguistics as a tool to decide the common meaning of statutory or constitutional terms.[2] Decades ago, the Supreme Court adopted a proto-corpus approach to illuminate the meaning of "carry a firearm" in *Muscarello v. United States*, 524 U.S. 125, 128-31 (1998) (discussing the phrase in context from literature, and newspaper articles found in computerized databases).[3] More recently, Justice Alito recognized the potential utility

---

[2] *See, e.g., Carpenter v. United States,* 585 U.S. 296, 347 n.4 (2018) (Thomas, J., dissenting) (citing historical corpus and Google Books to determine occurrence of "expectation(s) of privacy"); *Rice*, 36 F.4th at 583 n.6 (using corpus linguistics to determine the meaning of "strangulation"); *Waetzig v. Halliburton Energy Servs., Inc.*, 82 F.4th 918, 927 n.12 (10th Cir. 2023) ("final proceeding"); *Fulkerson v. Unum Life Ins. Co. of Am.*, 36 F.4th 678, 682-83 (6th Cir. 2022) ("reckless driving"); *United States v. Seefried*, 639 F.Supp.3d 8, 13-16 (D.D.C. 2022) ("administration of justice"); *Matthews v. Indus. Comm'n of Ariz.*, 520 P.3d 168, 175-77 (Ariz. 2022) ("injury by accident"); *In re Estate of Heater*, 498 P.3d 883, 890-91 (Utah 2021) ("natural parent"); *State v. Misch*, 256 A.3d 519, 529-30 (Vt. 2021) ("bear arms"); *Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 439-45 (6th Cir. 2019) (Thapar, J., concurring in part and in the judgment) ("results in" and "extending to"); *Richards v. Cox*, 450 P.3d 1074, 1079-81 (Utah 2019) ("employment in"); *People v. Harris*, 885 N.W.2d 832, 839 (Mich. 2016) ("information"); *United States v. Boler*, 115 F.4th 316, 333 n.9 (4th Cir. 2024) (collecting cases).

[3] As Lee and Mouritsen observed, corpus linguistics takes this "a step further by allowing us to use more reliable tools employed by linguists to gauge the most common usage of terms like 'carry' a firearm and 'harbor' an alien through searches of large databases producing replicable, falsifiable datasets of actual language usage." Thomas R. Lee & Stephen C. Mouritsen, *The Corpus and the Critics*, 88 U. Chi. L. Rev. 275, 292 (2021).

of corpus linguistics in legal interpretation. *Facebook, Inc. v. Duguid*, 592 U.S. 395, 412 (2021) (Alito, J., concurring).

Indeed, many judges on this Court in a recent en banc opinion used corpus linguistics to aid in determining the meaning of the statutory phrases such as "function of a trigger." *Cargill v. Garland*, 57 F.4th 447, 461 n.7 (5th Cir. 2023), *id*. at 478 n.3 (Ho, J., concurring).

Here, consistent with the definitions in Black's Law Dictionary, corpus linguistics analysis confirms that "sexual activity" in common usage almost always requires physical sexual contact.

The common understanding of "sexual activity" in 1998 can be determined by reviewing the contexts in which the term was used around that time. To accomplish this, Jimenez searched the Corpus of Contemporary American English (COCA) for "sexual activity" between 1995 and 1999, which yielded 150 results, with 105 unique entries.[4] Results were coded as follows: "1" was assigned to entries where context

---

[4] The complete results, methodology, and instructions are available at https://1drv.ms/x/c/8575b0ee6a265281/EdU7pBhOq6BLiVgrFn2FE54BzaunHEBKY HC0HeiBSupexw?e=rG8Ohh. Counsel will provide a digital file on request. COCA is available to the public and the court and the government can verify this analysis or do its own at www.english-corpora.org/coca.

expressly or implicitly refers to sexual activity involving bodily contact or physical presence in 1998. "2" was assigned to entries where context expressly or implicitly refers to remote sexual activity conducted without physical presence in 1998. This provides an empirical framework for analyzing how "sexual activity" was understood in 1998, and directly addresses the central question: did attempting to persuade another by text to photograph their pubic area constitute "sexual activity" as that term was then commonly understood?

As shown below, this study confirms that the answer is no. The overwhelming distribution shows that "sexual activity" in common usage entailed physical contact between two people, and certainly did not encompass requesting photos via technologies that were virtually nonexistent with consumers when the statute was enacted. Only one of the 105 unique results (Entry 100) showed that sexual activity could be accomplished without physical contact.

The following summaries from various contexts exemplify this:

**Disease Transmission**
- Entry 3: Article about HIV transmission in Africa: "In some countries, young people are delaying sexual activity until later in life."

- Entry 45: "hepatitis B [is] spread through sexual activity and contact with blood"
- Entry 60: "if an inmate, who is not HIV positive is found engaging in sexual activity, he is separated from the general population"
- Entry 138: "a genital lesion enables HIV to enter the bloodstream during sexual activity"

## Physical Intimacy

- Entry 10: "Married respondents reported levels of sexual activity about twice as high as singles"
- Entry 68: "My breasts . . . have always been a focal point in sexual activity. But I'm not open to Rob touching me there anymore"
- Entry 125: "Why does sexual activity sometimes dwindle after marriage, and does it have to be that way?"

## Pregnancy Prevention

- Entry 40: "she . . . avoids sexual activity that would result in pregnancy"
- Entry 46: "sexual activity of high-school students did not increase when they were given free condoms"
- Entry 107: "Sexual activity, with its attendant hazards . . . including disease and accidental pregnancy"

## Legal Contexts

- Entry 19: "Mann Act . . . Transportation across state lines for illegal sexual activity."
- Entry 48: "White House said it had no knowledge of anyone claiming to have seen any sexual activity between Clinton and Lewinsky."

- Entry 64: "Thirteen-year-old Tara Noble was lured by George Sam all the way to California via computer to engage in sexual activity"[5]

**Sexual Performance**

- Entries 43-44: "take Viagra 1 hour before beginning sexual activity" and "physical exertion of sexual activity"
- Entry 74: "legs, hips and pelvis, all key players in a man's sexual activity"
- Entry 93: "boxers abstain from any type of sexual activity before a big fight"

**Abstinence and Religious Contexts**

- Entry 39: "I believe that sexual activity should be an act of love, not lust" (referring to virginity pledge)
- Entry 133: "they are asked not to engage in any sexual activity beyond French kissing"
- Entry 148: "Buddhist women with a religious calling also renounce sexual activity"

The results should not be surprising, especially given the era. In 1998, "cybersex" was rare and sexting was nonexistent because commercially available phones did not have cameras, much less could they transmit photos wirelessly.[6] Given the technological limitations of

---

[5] Tellingly, the act of luring by computer wasn't characterized as sexual activity, only the physical act was.

[6] According to digitaltrends, the first retail U.S. camera phone was introduced in November 2002, and the technology to transmit photos by text came still later.

1998, passages referring generally to "sexual activity" would by default have been understood as entailing physical contact and likewise would not have been interpreted to include activities without physical contact. This default is comparable to how, in the 1940s, someone referring to "sending a message" would automatically be understood to mean transmission via then-existing methods like postal mail or telegram, not through email or text messaging. If a speaker intended to refer to sexual activity not involving contact, to avoid confusion they would have needed to explicitly mark this deviation with clarifying language (e.g., "virtual sexual activity" or "online sexual activity").[7]

This is precisely what occurred in the single instance from this corpus sample where "sexual activity" was used to reference nonphysical conduct: the writer, referring to "cyber sex," had to clarify it

---

Simon Hill, *A complete history of the camera phone*, digitaltrends (May 13, 2022), https://www.digitaltrends.com/mobile/camera-phone-history/

[7] This is an example of the Cooperative Principle described by philosopher of language Paul Grice, specifically the Maxim of Manner, which holds that speakers attempt to be clear and to avoid ambiguous or obscure language which can be interpreted in multiple ways. Itamar Shatz, *Grice's Maxims of Conversation: The Principles of Effective Communication*, Effectivology, https://effectiviology.com/principles-of-effective-communication/.

was a way of having "sexual activity *without physical contact*."[8] Even though this is a counterexample to the common understanding of sexual activity as entailing physical contact, the writer's need to make this clarification actually reinforces this default understanding of sexual activity and proves the rule.

This corpus analysis reinforces the Black's Dictionary definition by providing empirical evidence of how "sexual activity" was commonly understood in 1998: (1) "sexual activity" overwhelmingly referred to physical sexual contact; (2) "sexual activity" did not extend to requesting photos of body parts via text message or any other medium; and (3) "sexual activity" functions as a single grammatical unit with a specialized meaning substantially narrower than the combined dictionary definitions of its individual words. This final point is established by a search of COCA for "sexual NOUN" in 1995-99, which

---

[8] The full relevant passage was from a promotion for HBO's show *Real Sex*: "All new 'Real Sex.' Woman: Cyber sex to me means [t]hat you are connecting with people over the computer. And it's not your face, it's not your image. It is your words. Cyber sex means a way of having sexual thoughts or sexual activity without physical contact."

shows "sexual activity" is the third most frequent collocation.[9] This further confirms that this was an established compound term with a specialized meaning in common usage in 1998.

Finally, the ordinary meaning of "sexual activity" has not measurably drifted in the decades since its addition to § 2422. A COCA search of "sexual activity" for 2019, the year Jimenez was indicted, shows that the ordinary meaning of the term still almost always entails physical contact.[10]

Both Black's Law Dictionary and the empirical corpus evidence thus confirm that the ordinary meaning of "sexual activity" in 1998 never included requesting another to photograph a body part via text message.

### F. Additional empirical evidence shows "sexual activity" involves physical sexual contact

Another interpretive tool that courts employ is Google Books and web search data. *See*, *e.g.*, *Muscarello*, 524 U.S. at 128-31 (discussing

---

[9] The results are in the "'sexual NOUN' collocations" sheet in the corpus data.

[10] The results are in the "2019 Corpus" sheet in the corpus data.

the contextual meaning of "carry" from literature and computerized

newspaper databases); *Carpenter*, 585 U.S. at 347 n.4 (2018) (Thomas,

J., dissenting) (searching Google Books to determine occurrence of

"expectation(s) of privacy"); *State v. Rasabout*, 356 P.3d 1258, 1278-79

(Utah 2015) (Lee, J., concurring in part and concurring in the judgment)

(advancing Google search data in support of his interpretation of

"discharge[] a firearm"); *Radiological Soc'y of N. Am., Inc. v. Certain*

*Underwriters at Lloyd's of London*, No. 21 C 1265, 2021 U.S. Dist.

LEXIS 127306, at *8 (N.D. Ill. July 8, 2021) (conducting Google search

to aid in interpreting meaning of "if or unless").

A search for "sexual activity" from January 1, 1995, through

December 31, 1999, yielded academic materials[11], a sampling of which

again shows that the term almost exclusively meant interpersonal

sexual contact:

> "Sexual variations . . . . included sexual activity with
> animals and sexual interest in corpses."[12]

---

[11] Search results are at: https://tinyurl.com/y8umkumu.

[12] WP de Silva, *ABC of sexual health. Sexual variations*, BMJ (Mar. 1999),
https://pmc.ncbi.nlm.nih.gov/articles/PMC1115095/

"The Sexual Activity Questionnaire (SAQ) was developed to investigate the impact of long-term tamoxifen on the sexual functioning of women at high risk of developing breast cancer."[13]

"AIDS education, which was nearly universal in 1995, was associated with decreased sexual activity"[14]

"Unintended pregnancies and sexually transmitted diseases (STDs) have long been important considerations in college students' sexual activity, but in the past 15 years human immunodeficiency virus (HIV) has become a leading concern"[15]

"Drawing primarily on literature from sub-Saharan Africa, this article focuses on three behavioral outcomes: nonmarital sexual activity, contraceptive use, and condom use."[16]

Academic research on sexual activity is important because the

evidence suggests it influenced the public to adopt the term in ordinary

---

[13] K. Thirlaway, et al., *The Sexual Activity Questionnaire: a measure of women's sexual functioning*, Qual Life Res. (Feb. 5, 1996), https://pubmed.ncbi.nlm.nih.gov/8901370/

[14] Leighton Ku, et al., *Understanding Changes in Sexual Activity Among Young Metropolitan Men: 1979-1995* (Nov. 1998), https://www.guttmacher.org/journals/psrh/1998/11/understanding-changes-sexual-activity-among-young-metropolitan-men-1979-1995

[15] David M. Siegel, et al, *Sexual behavior, contraception, and risk among college students* Journal of Adolescent Health (Nov. 1999), https://www.sciencedirect.com/science/article/pii/S1054139X99000543

[16] Anastasia J. Gage, *Sexual Activity and Contraceptive Use: The Components of the Decisionmaking Process*, Studies in Family Planning (June 1998), https://doi.org/10.2307/172156

use.[17] A Google Books NGram search[18] shows that use of "sexual activity" first peaked in 1948 and again in 1953 when Alfred Kinsey published "Sexual Behavior in the Human Male" and "Sexual Behavior in the Human Female."[19] These academic works attracted extraordinary public attention and generated wide media coverage that introduced these clinical works to mainstream audiences.[20] Also per NGram, usage of "sexual activity" surged again during the "sexual revolution" of the 1960s and through the 1980s AIDS crisis when public discourse about

---

[17] For a comparable example of academic terminology entering everyday language, *see* Jon Kelly, *Sigmund Freud: The phrases you use without realising it*, BBC News (Sept. 19, 2014) (documenting how Freudian terms like "the unconscious" and "defense mechanism" evolved from specialized psychological concepts into widely used expressions) https://www.bbc.com/news/magazine-29251040.

[18] A graph of the search results is at https://books.google.com/ngrams/graph?content=sexual+activity&year_start=1900&year_end=2000&corpus=en-US&smoothing=0&caseinsensitive=false.

[19] Although "Sexual Behavior" was used in the title, "*sexual activity" and "*sexual activities" appears 291 times in a publicly available PDF of the 1948 volume, nearly as often as "*sexual behavior"(334 times). https://www.ipce.info/booksreborn/Kinsey%20Book%20Sexual%20behavior%20in%20the%20human%20male.pdf

[20] *Medicine: Behavior, After Kinsey*, Time (Apr. 12, 1948) ("In the 15 weeks since its publication, Dr. Alfred C. Kinsey's Sexual Behavior in the Human Male has risen nearly to the top of the bestseller list"), https://time.com/archive/6776248/medicine-behavior-after-kinsey/; *50 Years After The Kinsey Report*, CBS News (Jan. 27, 2003) ("[I]f the first book sparked a flame of controversy, the second book ignited an inferno. . . . The Kinsey report was a cultural event of enormous consequence"), https://www.cbsnews.com/news/50-years-after-the-kinsey-report/

physical sexual activity became more widespread and open. By 1998, when Congress added the term to § 2422, "sexual activity" had become firmly established in common usage as entailing interpersonal physical sexual contact.

Though it might be debatable whether "sexual activity" required interpersonal contact or included solo sexual conduct, that distinction is irrelevant here. Both Black's Law Dictionary and corpus evidence confirm the term's ordinary meaning in 1998 never included Jimenez's conduct. He requested P.W. take pubic-area photos but never tried to have sexual contact with her nor did he ask her to perform any kind of sex act while taking the photos. ROA.298-301. Criminalizing that conduct now would retroactively expand the statute beyond its original meaning. Because Jimenez's actions fall well outside what "sexual activity" meant in 1998, the government failed to prove this essential element of § 2422(b).

### G. Circuit courts disagree on the definition of "sexual activity"

This Circuit has not addressed the meaning of "sexual activity" under § 2422, but the three circuits that have done so reached opposing results. The Seventh Circuit held that "sexual activity" requires interpersonal sexual contact. *United States v. Taylor*, 640 F.3d 255, 257 (7th Cir. 2011). After examining the statutory scheme and noting that the statutory term "sexual act" is defined to require physical touching, the court concluded these terms were synonymous. It reasoned that if "sexual activity" encompassed a broader range of acts than "sexual act," "one would expect the term to be defined in the statute, to indicate just how broad that range was." *Id*. at 257, 259. The court also observed that 18 U.S.C. § 2427 explicitly defined "sexual activity" to include producing child pornography—a definition only necessary if the term requires contact, since "the creation of pornography doesn't involve contact between the pornographer and another person; this is further evidence that 'sexual activity' as used in the federal criminal code does require contact." *Id*. at 259. Finally, the court held that even if "there are two equally plausible interpretations" of "sexual activity," the defendant is

entitled to the benefit of the more lenient one. *Taylor* at 259-60, *citing United States v. Santos*, 553 U.S. 507, 514 (2008). In addition to the reasons discussed above, Seventh Circuit's rationale should be credited here.

In contrast, and disregarding the principles enunciated by the Supreme Court the year before in *FCC v. AT&T*, the Fourth Circuit in *United States v. Fugit*, 703 F.3d 248, 254 (4th Cir. 2012) simply looked up dictionary definitions of "sexual" and "activity" and recombined them to construct an artificially broad definition. The court concluded that "as a matter of plain meaning, the phrase 'sexual activity' . . . comprises conduct connected with the 'active pursuit of libidinal gratification' the part of any individual," adding that "[t]he fact that such conduct need not involve interpersonal physical contact is self-evident." *Id*. at 255.

The Eleventh Circuit adopted a similar approach in *United States v. Dominguez*, 997 F.3d 1121, 1124-25 (11th Cir. 2021). Though the court acknowledged that the inquiry "start[s] with the text and its ordinary public meaning at the time of enactment," it too simply cleaved "sexual activity" into individual words, then combined their dictionary

definitions to define it as "an action or pursuit relating to intercourse or to the desire for sex or carnal pleasure." *Ibid.*

In a footnote, the court dismissed the Black's Law Dictionary definition discussed above, committing multiple errors in doing so. Despite acknowledging it as "an authoritative source" and the only contemporary dictionary defining "sexual activity," the court announced without analysis that "we do not put too much stock in this particular entry because 'sexual relations' is not synonymous with 'sexual activity.'" *Id.* at 1125 n.2. The court posited that "sexual activity" is "broader than" sexual relations because while "sexual relations suggests the involvement of another person, and ensuing interpersonal physical contact of some sort, 'sexual activity' does not." *Ibid.* In support, the court relied on (1) the concurring opinion in *Taylor* claiming that "sexual activity is a broader term," *Taylor*, 640 F.3d at 260 (Manion, J., concurring); (2) a 2005 encyclopedia definition of a *different* term, "sexual behavior"; and (3) a 2012 definition of yet another term, "sexual conduct." *Id.* The court offered no reason for relying on an unsupported claim in a concurring opinion and definitions of other terms not even at

issue. Moreover, none of its sources shed light on the ordinary meaning of the phrase "sexual activity" nor how it was commonly understood in 1998.

The court could have avoided these errors because when *Dominguez* was issued in 2021, English-language corpora were widely available for analyzing word usage. Indeed, *Dominguez*'s author, Judge Jordan, months earlier joined a dissent citing criticizing mechanical dictionary-based definitions of phrases and citied a corpus linguistics article in support. *Jones v. Governor of Fla.*, 975 F.3d 1016, 1103-04 (11th Cir. 2020) (en banc) (Martin, J., dissenting), *citing* Stephanie H. Barclay, et al., *Original Meaning and the Establishment Clause: A Corpus Linguistics Analysis*, 61 Ariz. L. Rev. 505, 528-29 (2019).

Most important, *Fugit*'s and *Dominguez*'s methods for reaching their expansive definitions directly contradict the Supreme Court's unanimous guidance in *FCC v. AT&T*. As Chief Justice Roberts instructed, courts cannot simply treat a phrase "as the sum of its two words" because "two words together may assume a more particular meaning than those words in isolation." *FCC v. AT&T Inc.*, 562 U.S. at

406. These courts not only disregarded sound Supreme Court precedent, they also ignored the empirically established common understanding of "sexual activity" as shown through analysis of actual usage. These opinions are thus unpersuasive.

## H. The rule of lenity requires adopting the narrower interpretation of "sexual activity"

The Supreme Court has long held that "all reasonable doubts concerning [the] meaning [of a penal statute] . . . operate in favor of [the defendant]." *Harrison v. Vose*, 50 U.S. 372, 378 (1850). When presented with two fair alternatives, courts adopt the narrower construction of a criminal statute to avoid constitutional concerns that would arise from a broader reading. *United States v. Rumely*, 345 U.S. 41, 45, 47 (1953); *see also Skilling v. United States*, 561 U.S. 358, 405-06 (2010). When standard principles of statutory interpretation "fail to establish that the Government's position is unambiguously correct . . . [the court] resolve[s] the ambiguity in [the defendant's] favor." *United States v. Granderson*, 511 U.S. 39, 54 (1994); *see also Moskal v. United States*,

498 U.S. 103, 108 (1990) (applying rule of lenity where "reasonable doubt persists about a statute's intended scope").

Even if this Court harbors some doubt over whether the ordinary meaning of "sexual activity" includes non-physical conduct, Jimenez's request for photos, with no attempt to establish physical contact of any kind, certainly does not unambiguously fall within the statute's scope. The rule of lenity thus requires resolving any doubt in Jimenez's favor.

## I. Congress's 2023 amendment cannot alter the original public meaning of "sexual activity" in 1998

As shown above, when Congress added "sexual activity" to § 2422(b) in 1998, the term had an established common meaning requiring physical sexual contact. This Court is bound to apply that meaning because it is a "fundamental canon of statutory construction" that words generally should be "interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018).

Congress recently amended § 2427 to add that "the term 'sexual activity for which any person can be charged with a criminal offense'

does not require interpersonal physical contact." 18 U.S.C. § 2427. This is not a definition of "sexual activity," only a declaration what it does not "require." In any case, the amendment still does not cover solo sexual behavior such as masturbation, and it is undisputed that Jimenez, unlike the defendant in *Taylor*, 640 F.3d at 257-59, did not attempt to have the minor touch herself. ROA.298-301.

But even assuming it did apply, no act of Congress can retroactively alter how a term was commonly understood 25 years earlier. To try to do so would expand criminal liability and violate due process, fair notice, and possibly violate the rule against ex post facto laws by making previously non-criminal activities criminal. *See Calder v. Bull*, 3 U.S. (3 Dall.) 386, 391 (1798).

The government charged Jimenez with attempting to persuade a minor to engage in "sexual activity for which any person can be charged with a criminal offense." Because the ordinary meaning of this term required actual sexual contact in 1998, and the government conceded that did not occur here, ROA.298-301, the evidence cannot support Jimenez's conviction for Count One.

**II.** **The evidence was insufficient to prove that Jimenez attempted to persuade P.W. to engage in "sexually explicit conduct"—specifically "lascivious exhibition" of the pubic area—because Jimenez's requests for photos specified nothing that would make them objectively lascivious**

As its predicate crime under § 2422, the government alleged that Jimenez violated 18 U.S.C. § 2251(a), which required it prove that Jimenez attempted to persuade P.W. to send an image depicting "sexually explicit conduct," specifically the "lascivious exhibition" of the pubic area under § 2256(2)(A)(v).

Jimenez acknowledges requesting images for his own sexual purposes but argues that is only relevant to § 2251(a)'s intent element, not whether the requested images depict lascivious exhibition. Some courts consider subjective intent in deciding whether an image is lascivious while others only consider what's contained in the four corners of the image, while this Court has not squarely addressed that issue. The central question, then, is whether this Court may consider a defendant's subjective purpose or whether it must limit its analysis to objective features visible within the image in determining whether it is lascivious.

The Supreme Court requires the objective approach because it has repeatedly limited child pornography laws to images that *visually* depict sexual conduct. The Court's emphasis on visual depiction necessarily limits the determination of lasciviousness to what is observable within the image itself. While a defendant's intent remains relevant for the mental state element of the crime, it cannot transform a visually non-lascivious image into a lascivious one.

Courts have struggled with this distinction when applying the so-called "*Dost* factors." This has created confusion and inconsistency across circuits over objective versus subjective analysis.

In *United States v. Wilkerson*, 124 F.4th 361, 371 (5th Cir. 2024), this Court acknowledged that subjective feelings are irrelevant to this inquiry but then relied on subjective evidence under different labels. Because no Fifth Circuit panel has meaningfully analyzed this issue, this Court should follow Supreme Court precedent and hold that objective analysis is required.

Applying the *Dost* factors objectively, Jimenez's requests for photos without specifying poses, settings, or features that would make

them lascivious cannot satisfy the "lascivious exhibition" element. The evidence is therefore insufficient to support his conviction.

## A. Supreme Court precedent requires objective analysis of whether images are lascivious

The Supreme Court in *New York v. Ferber* emphasized that to survive overbreadth challenges, child pornography laws must be "limited to works that *visually* depict sexual conduct by children." 458 U.S. 747, 764 (1982) (emphasis in original). It also held that "nudity, without more is protected expression." *Id*. at 766. The Court thus established that images must be evaluated by what is visible within their four corners.

The Court confirmed this in *United States v. Williams*, emphasizing that Congress's prohibition of images depicting "sexually *explicit* conduct," rather than merely "sexual conduct," created a narrower definition that is "more immune from facial constitutional attack." 553 U.S. 285, 296-97 (2008) (emphasis in original). The Court's emphasis on "explicit" conduct reinforces that the sexually explicit nature must be objectively apparent from the image itself, not implied

or dependent on a viewer's subjective interpretation. Finally, the Court rejected attempts to rely on subjective interpretation of images defined by section 2256(2)(A)(v):

> [T]he Eleventh Circuit ... thought that the statute could apply to someone who subjectively believes that an innocuous picture of a child is "lascivious." (Clause (v) of the definition of 'sexually explicit conduct' is "lascivious exhibition of the genitals or pubic area of any person." § 2256 (2)(A).... That is not so. The defendant must believe that the picture contains certain material, and that material ***in fact*** (and not merely in his estimation) must meet the statutory definition.

553 U.S. at 301 (emphasis added).

Therefore, *Ferber*'s limiting prosecutions to images that "*visually depict sexual conduct by children*" and *Williams*' requirement that images prosecuted under § 2251 depict "sexually *explicit* conduct" necessarily require objective analysis of alleged "lascivious exhibition." This requirement prevents the unconstitutional criminalization of otherwise protected images based on a defendant's thoughts or purposes. *See Ferber*, 458 U.S. at 764. Subjective intent is certainly relevant for establishing the mental state element of this offense, but

not for determining whether the content of the image itself meets the statutory definition of "lascivious exhibition."

The D.C. Circuit faithfully applied this precedent in *United States v. Hillie*, 14 F.4th 677 (D.C. Cir. 2021). As it observed, "lascivious exhibition" refers to the minor's conduct that the visual depiction captures, not to the visual depiction itself. *Id*. at 688. The court held that "lascivious exhibition" requires that a minor "engage[] in conduct displaying their anus, genitalia, or pubic area in a lustful manner that connotes the commission of sexual intercourse, bestiality, masturbation, or sadistic or masochistic abuse." *Id*. This recognizes that § 2251 criminalizes a defendant's requesting minors to engage in sexually explicit conduct, not just requesting nude photos.

Jimenez's requests for photos did not specify any poses, settings, or conduct that would make such photos "sexually *explicit*." Under *Williams*, *Ferber*, and as shown below, the statutory text, this cannot constitute attempted production of images containing *lascivious* exhibition of the pubic area, just exhibition of it. Because Supreme Court precedent requires proof of actual sexual conduct, not mere

nudity, and that determination must rest on objective analysis, the government failed to prove this element.

No panel of this Circuit has meaningfully addressed this issue, and several circuits have split on objective versus subjective approaches in determining lasciviousness. As shown in the following sections, this Court should adopt an objective approach because a principled reading of Supreme Court precedent and the statutory text, as well as correct application of the *Dost* factors, require it.

**B.    Circuit courts disagree on whether to apply an objective or subjective analysis of "lascivious exhibition"**

Some circuits require images be assessed for lasciviousness based on the objective or visual features of an image while others consider varying degrees of contextual or subjective evidence to make that decision.

In United *States v. Villard*, 885 F.2d 117, 125 (3d Cir. 1989), a pre-*Dost* case addressing same definitional statute here, the court held that it must "look at the photograph, rather than the viewer," adding that "[i]f we were to conclude that the photographs were lascivious

merely because [the viewer] found them sexually arousing, we would be engaging in conclusory bootstrapping rather than the task at hand." In *United States v. Amirault*, 173 F.3d 28, 34 (1st Cir. 1999), the court recognized that if the defendant's "subjective reaction were relevant, a sexual deviant's quirks could turn a Sears catalog into pornography." And *United States v. Spoor*, 904 F.3d 141, 150 (2d Cir. 2018) held that *Dost* Factor 6 "should be considered by the jury in a child pornography production case only to the extent that it is relevant to the jury's analysis of the five other factors and the objective elements of the image."

Conversely, *United States v. Brown*, 579 F.3d 672, 683 (6th Cir. 2009) held that courts may apply a "limited context" test that "permits consideration of the context in which the images were taken but limits the consideration of contextual evidence to the circumstances directly related to the taking of the images." In *United States v. Wallenfang*, 568 F.3d 649, 659-660 (8th Cir. 2009), the court held that "[b]y uploading the pictures of the child to the newsgroup, a jury could reasonably find that Wallenfang portrayed the child as a sexual object for viewers."

Last, the court in *United States v. Courtade*, 929 F.3d 186, 192 (4th Cir. 2019) took a neutral stance by declining to "venture into the thicket surrounding the *Dost* factors or define the parameters of any subjective-intent inquiry."

### C. This Circuit has not squarely addressed whether to apply an objective or subjective analysis

This Court in *Wilkerson*, 124 F.4th at 367-69 held that circuit precedent holds that "lascivious exhibition" must be performed "in a lustful manner that connotes the commission of a sexual act," and courts must apply the *Dost* factors, *id*. Jimenez acknowledges that this panel must continue following that precedent.

But no panel has squarely addressed whether objective analysis of lasciviousness is mandated by *Ferber*'s emphasis that to comply with the First Amendment, the images must "*visually* depict sexual conduct," *Williams*' similar emphasis that images charged under section 2251 depict "sexually *explicit* conduct," or the statutory text itself. Because no panel has directly analyzed how this objective requirement affects the

*Dost* analysis, this Court should require lasciviousness to be determined by examining only what in fact appears in the image.

In *Wilkerson*, this Court seemed to take the objective approach when it stated that "the subjective feelings of any particular viewer is not part of the inquiry under this factor." 124 F.4th at 371 n.46, *citing United States v. Steen*, 634 F.3d 822, 829 (5th Cir. 2011) (Higginbotham, J., concurring). But right after making that statement, the court relied on subjective evidence by recharacterizing it as proof of "purpose" and "design." The court did not identify any legal basis for considering a defendant's purpose to determine whether an image is lascivious. As counsel understands it, the court appears to have conflated two distinct statutory provisions: the intent requirement under § 2251(a) and the definition of "lascivious exhibition" under § 2256(2)(A)(v).

This apparent contradiction between acknowledging that subjective evidence is irrelevant while simultaneously using it under another label illustrates the unworkability of this approach. As one scholar observed, allowing consideration of defendants' subjective

content "has produced a profoundly incoherent body of case law." *See, e.g.*, Amy Adler, *Inverting the First Amendment*, 149 U. Penn. L. Rev. 921, 953 (2001).

Before *Wilkerson*, in an unpublished opinion, the court in *United States v. Barry,* 634 F. App'x 407, 414 (5th Cir. 2015) read *Steen* as permitting "broader consideration of context." But *Steen* merely referenced a Missouri District Court case mentioning "limited context" in passing to find the evidence was *insufficient* to support lascivious exhibition. *Steen*, 634 F.3d at 828, *quoting United States v. Johnson*, 719 F. Supp. 2d 1059, 1068 (W.D. Mo. 2010) *rev'd*, 639 F.3d 433 (8th Cir. 2011). Indeed, *Steen* itself reversed the conviction despite evidence of voyeuristic purpose. *Steen* at 828. In any case, neither *Steen* nor *Barry* meaningfully addressed this issue, and counsel's research did not turn up any circuit opinions that has.

The rule of orderliness does not bind this Court to follow dicta or holdings on issues not directly addressed. *United States v. Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980) (holding that panels are not bound by dicta, "even of our own court"). Therefore, this Court should

determine lasciviousness based on the four corners of the image. This is the only approach consistent with *Ferber* and *Williams*, and as shown in the next section, the plain language of the statute.

### D. The statute's text and structure require objective analysis of "lascivious exhibition"

In addition to in *Ferber* and *Williams* requiring objective analysis to constrain First Amendment overbreadth, the statutory text requires objective analysis. Under § 2256, "sexually explicit conduct" is defined five ways:

(i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;

(ii) bestiality;

(iii) masturbation;

(iv) sadistic or masochistic abuse; or

(v) lascivious exhibition of the anus, genitals, or pubic area of any person

18 U.S.C. § 2256(2)(A).

Nothing in the text permits consideration of a defendant's subjective content. Rather, it defines "sexually explicit conduct" through objective criteria with no reference to intent or purpose.

The structure of § 2256(2)(A) further confirms that lascivious exhibition requires objective analysis. Under the canon of noscitur a sociis, "a word is given more precise content by the neighboring words with which it is associated." *Williams*, 553 U.S. at 294. The first four categories of § 2256(2)(A)--sexual intercourse; bestiality; masturbation; sadistic or masochistic abuse--describe physical acts that either visibly appear in an image or do not. The fifth category, lascivious exhibition, logically follows this same objective pattern. It also refers only to the *minor's* exhibition. Interpreting "lascivious exhibition" to depend on subjective factors breaks from this pattern and contradicts both Supreme Court precedent and the statutory text and structure.

Finally, Congress knows how to include subjective intent or purpose in a statute, and if it wanted to do so in § 2256(2)(A)(v), it easily could have, as it did in § 2251(a). *Cf. Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (holding that where Congress includes

particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally in the disparate inclusion or exclusion).

The circuits that nonetheless import subjective purpose into the definition of "lascivious exhibition" have effectively rewritten the statute to add a basis for criminal liability that Congress purposefully did not include. Such judicial amendment violates basic principles of statutory interpretation requiring courts to "presume that a legislature says in a statute what it means and means in a statute what it says." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

Therefore, a principled interpretation of the statute's text requires objective analysis to determine whether an image is lascivious under § 2256(2)(A)(v).

### E.    Courts cannot use evidence supporting the intent element under § 2251(a) to establish "lascivious exhibition" under § 2256(2)(A)(v)

As mentioned above, some courts appear to be conflating the defendant's intent under § 2251(a) and the definition of sexually explicit conduct under § 2256. But these distinct elements must be analyzed

independently. *United States v. Bailey*, 444 U.S. 394, 406 (1980). So while evidence of a defendant's sexual purpose properly might satisfy § 2251(a)'s intent requirement, that same evidence cannot be used to find that an image is lascivious under § 2256.

This problem becomes particularly clear in courts' struggles with the *Dost* factors, which this circuit adopted to "assess lasciviousness." *Steen*, 634 F.3d at 826, *citing United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986), *aff'd*, 813 F.2d 1231 (9th Cir. 1987). By far the biggest problems arise when applying Factor 6—"whether the visual depiction is intended or designed to elicit a sexual response"—which this Circuit acknowledges is "the most difficult to apply." *Steen*, 634 F.3d at 827-28. The First Circuit has called it the "most confusing and contentious" factor. *Amirault*, 173 F.3d at 34. The Fourth Circuit describes it as "[p]articularly divisive," creating a "thicket" for judges. *United States v. Courtade*, 929 F.3d 186, 192 (4th Cir. 2019). This confusion appears to be at least partially responsible for the circuit split regarding whether courts may consider subjective intent under Factor 6.

But if the *Dost* factors must be applied, only an objective analysis aligns with Supreme Court precedent and Congress's statutory design. Indeed, the author of *Dost*, Judge Thompson, set out an objective approach. There, he specified that "the determination will have to be made based on the *overall content of the visual depiction*." *Dost*, 636 F.Supp. at 832 (emphasis added). He said nothing about considering a defendant's intent or purpose in this analysis. And when giving examples and applying Factor 6, Judge Thompson never considered the defendant's subjective intent.[21] *Id.* at 832-33. Based on this, *Dost* itself requires objective analysis of images.

Unfortunately, the judge's passive-voice phrasing in Factor 6 is ambiguous and thus has created confusion because "whether the visual depiction is intended or designed to elicit a sexual response" seems to bless subjective analysis. But proper construction of the passive voice requires objective analysis. As the Supreme Court explained in *Dean v.*

---

[21] Judge Thompson parenthetically mentioned the minor's "unusual pose is one that an ordinary child would not normally assume but for  adult coaching (as was the case here)," *Dost*, 636 F. Supp. at 832, but this reflects an inference about the image, not consideration of the defendant's subjective purpose. And at worst, it permits additional context. When applying Factor 6, Judge Thompson never considered the defendant's subjective intent.

*United States*, passive voice describes "an event that occurs without respect to a specific actor, and therefore without respect to any actor's intent or culpability." 556 U.S. 568, 572 (2009). As such, passive voice in statutes focuses attention away from specific actors and their intentions. Justice Barrett recently reinforced this principle, noting that passive voice "pulls the actor off the stage" and directs attention to "whether something happened—not how or why it happened." *Bartenwerfer v. Buckley*, 598 U.S. 69, 76 (2023). Further, "the passive voice signifies that 'the actor is unimportant' or 'unknown.'" *Ibid.*, quoting B. Garner, *Modern English Usage* 676 (4th ed. 2016).

These principles applied to Factor 6 thus require courts to examine whether the image itself contains objectively sexual characteristics, not whether any particular person intended it for sexual purposes. That is, by removing any specific actor, Factor 6's "is intended or designed" shifts focus from who might have intended something to features of the image itself. Courts thus violate sound principles of passive voice interpretation by reflexively using "is intended" as license to consider a defendant's subjective purpose. Thus, the appropriate

inquiry is whether the image itself contains features that objectively show such design, not whether any particular person subjectively intended it for that purpose. This mirrors the analysis Judge Thompson himself conducted in *Dost*.

*Wilkerson* illustrates how courts blur statutory elements when applying Factor 6. The court correctly agreed with Wilkerson that "the subjective feelings of any particular viewer is not part of the inquiry under this factor." *Wilkerson* at 371 fn.46, *citing Steen* at 829 (Higginbotham, J., concurring). But it immediately used subjective evidence under a different label, stating that "[t]he question is not whether the viewer or maker of a visual depiction himself has a sexual response, it is whether the purpose of producing the depiction and its design is to elicit such a response. For example, a photographer may be guilty of child pornography for images he produces for the purpose of selling them to pedophiles, even if the photographer himself is not aroused by the images." *Id*. The court thus concluded that "the relevance of the video's audio is not in showing that Wilkerson actually had a sexual response; rather, it is evidence that Wilkerson's purpose in

capturing the video and the video's design was to elicit a sexual response." *Ibid.*

This contradicts the Supreme Court and the statutory text. Though *Wilkerson* correctly states that images created for a sexual purpose (like selling to pedophiles) can be criminal regardless of their objective content, that applies to crimes such as the pandering provision in 18 U.S.C. § 2252A(a)(3)(B) but not to the statutes at issue, §§ 2251(a) and 2256(2)(A)(v). The pandering provision of 2252A(a)(3)(B) criminalizes the act of knowingly promoting "any material or *purported* material in a manner that reflects the belief, or that is *intended to cause another to believe*, that the material or purported material is, or contains" child pornography. This criminalizes the *representation* of material as child pornography even if the material itself does not meet the legal definition of child pornography. But this analysis is distinct from determining whether an image constitutes actually depicts sexually explicit conduct or lascivious exhibition under § 2256.

This illustrates how using subjective purpose to determine lasciviousness allows courts to criminalize images based on intent

rather than content, contradicting *Ferber*'s emphasis that images must "*visually* depict sexual conduct."

Because Jimenez requested images without any specifications about pose, setting, or presentation that would make them objectively lascivious, the government failed to prove this element.

As shown in the next section, the *Dost* factors properly applied cannot establish lascivious exhibition.

**F.      The evidence fails to support "lascivious exhibition" under the *Dost* factors objectively applied**

Jimenez recognizes that applying subjective evidence to satisfy the *Dost* factors would likely defeat his claim. But by properly applying objective analysis, no rational trier of fact could find sufficient evidence that he requested a lascivious image.

**1.      Whether the focal point of the visual depiction is on the child's genitalia or pubic area**

Jimenez requested a photo of P.W.'s pubic part. ROA.246.

**2.      Whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity**

Jimenez made no request about setting, pose, or any other

contextual elements.

### 3. Whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child

Jimenez did not request any pose or attire.

### 4. Whether the child is fully or partially clothed, or nude

His requests suggested nudity, but as this court has consistently

held, nudity alone cannot establish lasciviousness. *Steen*, at 827 (citing

*Ferber*, 458 U.S. at 765 n.18).

### 5. Whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity

Jimenez did not request photos suggesting coyness or willingness

to engage in sexual activity.

### 6. Whether the visual depiction is intended or designed to elicit a sexual response in the viewer

Applying the objective test, none of the photos Jimenez requested

would have contained features suggesting they were designed to elicit a

sexual response. When examining factor 6 objectively, courts must look

for visual elements within the image itself that indicate sexual design,

such as props, settings, or poses that show lasciviousness. A plain photo of the pubic area contains no such objective indicators. It is an exhibition of the pubic area but not a *lascivious* exhibition of it. To hold otherwise would violate a cardinal rule of statutory construction by failing to give effect to the statutory term, "lascivious exhibition," which Congress intended to mean more than just "exhibition." *See Mkt. Co. v. Hoffman*, 101 U.S. 112, 115 (1879) ("We are not at liberty to construe any statute so as to deny effect to any part of its language. It is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word").

Considering these factors and whether "the overall content of the *visual* depiction" was lascivious, *Dost*, 636 F.Supp. at 832 (emphasis added), the evidence is insufficient. While Jimenez's conduct was reprehensible and he remains imprisoned on related charges, his conviction on this count cannot stand under the law. This Court should reverse.

### G. The rule of lenity requires adopting the narrower interpretation of "lascivious exhibition"

As with "sexual activity" in the previous issue, if this Court finds

that "lascivious exhibition" could plausibly encompass non-lascivious

images, the rule of lenity requires adopting the narrower interpretation.

*Moskal*, 498 U.S. at 108 (applying rule of lenity where "reasonable

doubt persists about a statute's intended scope").

## Conclusion

This Court should reverse Jimenez's conviction under Count One

and order a judgment of acquittal.

DATE: March 15, 2025        Respectfully submitted,

s/ Mark Russell Yanis
Attorney for Appellant

## Certificate of Service and Compliance with ECF

I certify that on March 15, 2025, I served Appellant's Brief via the Court's CM/ECF Document Filing System, upon the following registered CM/ECF users: I certify that on March 15, 2025, I served Appellant's Brief via the Court's CM/ECF Document Filing System, upon the following registered CM/ECF users:

> U.S. Attorney's Office
> Southern District of Texas
> 1000 Louisiana, Ste. 2300
> Houston, TX 77002

I further certify that (1) required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with 25.2.1; and (3) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

1. This brief complies with the type limitation of Fed. R. App. P. 32(a)(7)(B).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using MS Word in 14-point Century Schoolbook typeface.

3. This brief contains 11,134 words exclusive of ROA designations and excludable sections.

DATE: March 15, 2025       s/ Mark Russell Yanis
                                        Attorney for appellant